UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JANSSEN ASKEW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:18-cv-02139-DML-TWP |
| | ) |
| WAL-MART STORES, INC., | ) |
| | ) |
| Defendant. | ) |

Order on Defendant's Motion for Summary Judgment

Defendant Wal-Mart Stores, Inc. [1] seeks summary judgment on the claims of its former employee, plaintiff Janssen Askew, who alleges that he was discriminated and retaliated against based on his race, in violation of Title VII. For the following reasons, the court GRANTS the defendant's motion for summary judgment.

**Summary Judgment Standard**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 569a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue of

---

[1] The defendant states that Mr. Askew incorrectly identified it as Wal-Mart Stores, Inc., and that his employer was Sam's East, Inc. Mr. Askew worked at a Sam's Club retail center. The court will refer to the defendant as "Sam's Club."

material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. The court views the facts in the light most favorable to the non-moving party, and all reasonable inferences are drawn in the non-movant's favor. *Barbera v. Pearson Education, Inc.,* 906 F.3d 621, 628 (7th Cir. 2018).

## Facts

The facts recited below are supported by admissible evidence in the record and are either undisputed by the parties or presented in the light most favorable to Mr. Askew, the nonmoving party.[2]

Mr. Askew began working for Sam's Club as a Tire and Battery Center Technician at Store #6316 in Indianapolis, Indiana on December 20, 2016. His primary duties were changing automobile batteries and rotating and balancing tires. (Declaration of Tracy Daniel, Dkt. 38-1, ¶ 8).[3] Mr. Askew's day-to-day work

---

[2] Mr. Askew, who is proceeding *pro se*, filed his summary judgment response in two parts, both of which were considered by the court. He first mailed his summary judgment response to the defendant's counsel but without filing it with the court. As directed by the court, the defendant tendered that response for filing, at Dkt. 41. Mr. Askew then filed that same response with the court, at Dkt. 42. After the defendant filed its reply brief (Dkt. 43), Mr. Askew filed a separate response, akin to a surreply, at Dkt. 44. While Mr. Askew did not include affidavit testimony to support many of the statements in his responses (at Dkts. 41/42 and 44), the defendant included portions of his deposition testimony as part of its summary judgment papers. To the extent the factual statements in Mr. Askew's responses are supported by his deposition testimony and are based on matters within his personal knowledge, and not merely unsupported conjecture, the court accepts Mr. Askew's statements as evidence admissible on summary judgment.

[3] Ms. Daniel was the Club Manager of this Sam's Club during the period at issue in this case. Daniel Dec., ¶ 3).

duties were directed by Christopher Yeary, who was the Service Manager (also known as the "team lead") of the Tire and Battery Center. Mr. Yeary is Caucasian. He had no authority to fire, demote, promote, transfer, or discipline Mr. Askew. (*Id.,* ¶ 9).

During Mr. Askew's employment, Sam's Club had in place a "Discrimination & Harassment Prevention Policy" and "Open Door Communications Policy," which together prohibited discriminatory actions or harassment based on a person's status. It also encouraged employees to bring observations and concerns to the attention of any supervisor or manager without fear of retaliation and included (among other things) a reporting procedure for grievances. (Daniel Dec., Exhs. A and B).

Sam's Club also had an attendance policy (Daniel Dec., Exh. D that Mr. Askew understood. (Askew Dep., Dkt. 38-2, p. 31, lines 13-16 (or 31:13-16). The policy addressed discipline for frequency of absences, coming to work late (being tardy), and when an employee was a no call/no show, *i.e.,* failing both to come to work and report the absence in advance. Under the attendance policy, when an employee accumulates three consecutive no-show/no-call transgressions, the consequence is termination:

> If you are absent for three consecutive workdays (and do not report your absences by calling a member of management or using the Report an Absence form available on WalmartOne), we will consider you to have abandoned your job, which will result in your voluntary termination of employment.

(Daniel Decl., ¶ 7 and Exh. C).

Mr. Askew was issued a "First Written Coaching" by assistant manager Joseph Hull (who is Caucasian) on April 21, 2017, for violating the attendance policy's frequency rules. By that time, he had three unscheduled absences in a rolling six-month period, consisting of two unscheduled full-day absences and three late-to-work days (counting as one unscheduled full-day absence). (*See* Daniel Dec., ¶ 10 and "Unauthorized Absences" section of attendance policy, Dkt. 38-1 at p. 18). [4]

About a month later, on May 26, 2017, Mr. Askew approached two assistant managers in the manager's office, Kenetra McFarland and Alonzo Wise (both African American), to make a grievance. Assistant manager Hull was also present, but when Mr. Askew asked to speak only with Ms. McFarland and Mr. Wise, Mr. Hull left the room. Mr. Askew believed that Mr. Hull, who apparently assisted in managing the Tire Center, had been involved in intimating that Mr. Askew was responsible for batteries that had gone missing from a battery cage in the Tire Center.[5] Mr. Askew reported his belief that he was being harassed for racially discriminatory reasons, but other than mentioning the "battery cage" matter, Mr. Askew did not verbally provide any information about his beliefs to assistant

---

[4] Although Mr. Askew states that other employees who were absent or late to work more than he was did not receive coaching, he offers no support for that statement. He does not specifically identify any such employees, state whether they are or are not African American, or submit any evidence documenting their absences or discipline.

[5] Other than Mr. Askew's personal belief that Mr. Hull (or others) thought he was responsible for missing batteries, there is no evidence on summary judgment that Mr. Hull held such a belief. There is no evidence anyone formally or informally accused Mr. Askew of such behavior.

managers McFarland and Wise at that time. The managers gave Mr. Askew a form to make a written report of his complaints.  Mr. Askew wrote a two-page statement on the form and gave it to Ms. McFarland and Mr. Wise the next day, on May 27.

He described various incidents over the course of his employment (which had begun in late December 2016) he regarded as indicative of racial prejudice, nearly exclusively by Mr. Yeary.  The statement said that Mr. Yeary (a) once (or more than once) remarked that Mr. Askew probably wanted some chicken from the Sam's Club store and asked another employee to get Mr. Askew some chicken, (b) once remarked that Mr. Askew should wait until summer when watermelons were for sale and watch the female customers bend over to pick watermelons out of a bin because he could "get a good look" (which Mr. Askew inferred was referring to African American women), (c) once remarked while knotting a trash bag that maybe Mr. Askew's neck could go into the looped tie (which Mr. Askew perceived as the creation of a noose), (d) once remarked that customers at Sam's Club would try to cheat the system, buying expensive food and then returning it for cash (which Mr. Askew inferred was a complaint about African American customers of Sam's Club), (e) asked Mr. Askew twice if he knew how to bury a dead body and remarked one of those times that a dead body could be hidden by burying it with limes to disguise the smell (at one point an empty box once containing limes appeared in the Tire Center and was used to hold some batteries), (f) made a remark about President John F. Kennedy's death and said he had "pissed off the wrong people," and (g) insinuated, along with Joseph Hull and William Bennett (an

asset protection employee), that Mr. Askew was responsible for missing batteries, and Mr. Askew would not be permitted to close the shop by himself. Mr. Askew also wrote in his statement that once when a tire rolled out of the Tire Center seemingly on its own, Mr. Bennett said that the Sam's Club had been built over an old Indian burial ground.

 The manager of the Sam's Club store, Tracy Daniel (who is African American), reviewed Mr. Askew's statement when she returned from vacation in early June 2017 and began investigating Mr. Askew's complaints. She first interviewed Mr. Hull and Mr. Bennett and was told that (1) although batteries were missing from a battery cage (used to store old batteries for recycling) that had been broken into, no one implied Mr. Askew had taken them and (2) although Mr. Hull had said that Mr. Askew could not close the shop on his own, that policy applied to all associate employees, and Mr. Hull had not singled out Mr. Askew as being unable to do so. Then, on June 9, 2017, Ms. Daniel interviewed Mr. Askew about the contents of his May 27, 2017 statement. At that time, Mr. Askew made additional allegations about Mr. Yeary's treatment of him, including that (a) he felt targeted by Yeary because other employees seemed to know about Mr. Askew's mistakes before Mr. Askew knew about them, (b) Yeary made many "back-handed" comments, (c) Yeary played "mind games" such as asking Mr. Askew if he would jump a fence, (d) Yeary had taken a pallet jack away from him while he was trying to use it, and (e) Yeary was rude to another employee when he was frustrated. Mr.

Askew also said that he felt he did not receive as much training as other employees (some of whom were also African American and had the same job as Mr. Askew).

One week later, Mr. Askew prepared a second written statement, dated June 16, 2017, describing incidents occurring after his May 27 statement which he believed were intended to intimidate him or were racially charged. He described that (a) Yeary expressed frustration one day about the city being overpopulated and later in the same conversation, stated he sometimes wished he could go out on his porch and start "shooting shit," (b) later in the same week, one of Yeary's friends visited him at the shop, and while they discussed the city's overpopulation, Yeary's friend said the city was overpopulated by "n_ _ _ _ _s," (c) about a week later, a customer remarked that he wanted to practice "vigilante" justice against "gangsters," and the next day, danger signs were located in one of the shop's drawers but were not there the day after that, and (d) once while Mr. Askew was alone working in the shop, a customer pulled up to the closed bay doors and simply sat there without getting out of his car.

Store manager Tracy Daniel continued her investigation and reviewed Mr. Askew's June 16 statement as part of her investigation.  On June 22, 2017, she interviewed two other shop employees who performed the same type of work as Mr. Askew, both of whom are also African American.  These employees reported to Ms. Daniel that they did not feel uncomfortable working in the shop and did not know of inappropriate comments.  One of these employees reported that Yeary joked around a lot, did not know when to stop joking, and acted as if he was always right.  She

7

then re-interviewed asset protection employee Bennett, whom Mr. Askew believed overheard Yeary's friend's "N-word" reference, and Bennett stated that he did not hear that comment. Ms. Daniel also reviewed security footage to determine whether it substantiated some of Mr. Askew's complaints. During this time frame in late June while Ms. Daniel was conducting her investigation, she was not able to interview Mr. Yeary because he had undergone surgery and was not at work.

    Mr. Askew called in sick to work on June 25, 26, and 27, 2017, saying he was not feeling well. On June 26, Ms. Daniel called Mr. Askew and informed him that (consistent with the attendance policy) if he was going to be absent because of illness for more than three days in a row, he must request a medical leave of absence or the absences would count against him. Mr. Askew did not request a leave of absence, and he began ignoring call-in requirements. He was scheduled to work on June 29, 2017, did not call in, and did not return a message left for him by Ms. Daniel. He was also a no-call/no-show on his scheduled shifts for July 1, 2, 3, 5, 7, 8, and 9. On July 9, 2017, an assistant manager called Mr. Askew about coming in on July 10, and he said he was not comfortable interacting with Mr. Yeary. Mr. Askew was told to call back on July 10, but he did not call back on July 10, and he did not call on July 11.

    Because Mr. Askew had missed so many work shifts, Club Manager Daniel terminated his employment on July 11, 2017, for violating the company's attendance policy. She called Mr. Askew on July 12 and told him he had been terminated because of his violations of the attendance policy. Ms. Daniel also told

Mr. Askew that he could reapply for a job and she could transfer him to a department where Mr. Yeary did not work or could hold a meeting between him and Mr. Yeary so they could work out their differences. Ms. Daniel also explained that she had not yet interviewed Mr. Yeary (who was absent from work because of surgery until at least July 18).[6] (Daniel Dec., ¶ 25). Mr. Yeary initially agreed to come in and speak with her, but he did not show up and later told Ms. Daniel that he had decided to not come back. (*Id.*).

The court now turns to its analysis of the parties' arguments on summary judgment.

## Analysis

Mr. Askew is *pro se*, and he has not articulated precisely how his allegations fit particular legal claims, but he asserts broadly that he was discriminated against based on his race and retaliated against because he had complained of race discrimination. His briefing refers to Mr. Yeary as his "primary abuser" and contains numerous allegations that Mr. Yeary's various statements and behavior toward him were in the nature of "racially-motivated harassment" that permeated his employment.[7] He also asserts that he was retaliated against for filing grievances and was constructively discharged.

---

[6]  Ms. Daniel interviewed Mr. Yeary on July 18; Mr. Yeary denied most of the allegations made by Mr. Askew and told Ms. Daniel he had had a hard time figuring out Mr. Askew. *See* Daniel Aff., Dkt.38-1, ¶¶ 26-27.

[7]  Although Mr. Askew's surreply, at Dkt. 44, also refers to Mr. Hull as somehow involved in creating a hostile work environment, he has provided no

9

The court first analyzes Mr. Askew's hostile work environment claim and then analyzes his assertions that the defendant's actions otherwise constitute race discrimination or retaliation.

### A. The defendant is entitled to summary judgment on Mr. Askew's hostile work environment claim.

Under Title VII, it is unlawful for an employer to discriminate against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e-2(a)(1). This includes prohibition of a "hostile work environment." *Vance v. Ball State University,* 570 U.S. 421, 427 (2013). To prevail on a hostile work environment claim, a plaintiff must show four things:

1. The work environment was objectively and subjectively offensive;
2. The harassment complained of was based on race;

---

evidence about Mr. Hull's actions that reasonably could be considered as race-based harassment or hostility. Although he suggested that Mr. Hull provided "coaching" to him for absences while other employees did not receive the same treatment, Mr. Askew submitted no evidence about other employees' attendance or discipline. Although he asserted that Mr. Hull "changed his schedule" unreasonably or "denied him lunch" twice, Mr. Askew submitted no evidence that other employees were treated differently and were not required to "open one day, close the next" or to sometimes keep working rather than take the scheduled lunch break. *See* Askew Dep., pp. 151-53. Regarding the "battery cage" incident, Mr. Askew presented no evidence that Mr. Hull (or anyone else) accused him of stealing batteries, nor is there any evidence Mr. Askew was treated differently from any other employee in the Tire Center with respect to the loss control employee's investigation of missing batteries from the battery cage.

      3. The harassment was severe or pervasive in character sufficiently to alter the conditions of employment and create an abusive or hostile atmosphere; and

      4. There is a basis for the employer's liability.

*Hunt v. Wal-Mart Stores, Inc.,* 931 F.3d 624, 627 (7th Cir. 2019); *Luckie v. Ameritech Corp.,* 389 F.3d 708, 714 (7th Cir. 2004). Sam's Club argues that many of the statements or actions on which Mr. Askew has based his hostile work environment claim do not have the kind of "racial character or purpose" that could support that claim and, in any event, he has not shown that any harassment was severe or pervasive. Sam's Club also argues there is no basis for its liability because the undisputed facts and reasonable inferences demonstrate that its investigation of Mr. Askew's claims was reasonable as a matter of law.

    There is sufficient evidence from which a jury could conclude that Mr. Yeary subjected Mr. Askew to offensive conduct based on race, thus meeting the first two elements of Mr. Askew's claim. While many of the statements and actions Mr. Askew complains of have no apparent connection with race—references to cheating customers, Indian burial grounds, missing batteries, burying dead bodies and using limes to camouflage the smell, and President John F. Kennedy's assassination—some of them are rooted in racist tropes or rationally could be perceived as racist. These include Yeary's references to chicken and watermelon, his comment that Mr. Askew's neck could be tied into the trash bag loop, and his telling Mr. Askew the city is over-populated, followed later in the week by the conversation Mr. Askew

11

overheard between Mr. Yeary and his friend about overpopulation in which the friend used the "N-word."

As to the third element, it is a close question whether there is sufficient evidence that racially harassing conduct was severe or persuasive enough to "alter the terms and conditions of employment." Though Mr. Askew apparently began to view nearly every interaction he had with Mr. Yeary or every statement by Mr. Yeary as carrying a racist overtones, there is no evidence that any other employees within the Tire Center who were also African American and who had the same job as Mr. Askew viewed the working environment as hostile at all, let alone one that was permeated with racist hostility. Further, the comments and statements by Mr. Yeary with any racial overtones are not alleged to have been frequently made or sometimes even directed at Mr. Askew: the reference to women (African American women, as Mr. Askew inferred) looking at watermelons was made once; the reference to Mr. Askew wanting chicken was made once or twice; the statement that Mr. Askew's neck could be tied into the trash bag happened once; and the "N-word" was not said by Mr. Yeary or any other employee (and was not directed at Mr. Askew), but was said by Mr. Yeary's visiting friend. *See, e.g., Johnson v. Advocate Health & Hosps. Corp.,* 892 F.3d 887, 900 (7th Cir. 2018) (internal quotation omitted) ("We expect a certain level of maturity and thick skin from employees. Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment.")

But even if a reasonable jury could conclude that Mr. Yeary had made Mr. Askew's work environment subjectively *and* objectively racially hostile and threatening, Mr. Askew's claim falters as a matter of law on the fourth element—a basis for Sam's Club's liability.

The analysis of an employer's liability for a racially hostile work environment depends on the "status" of the perpetrator of the abuse; here, Mr. Yeary. If Mr. Yeary is deemed a "supervisor," Sam's Club is "strictly liable" unless it can show that (1) it exercised reasonable care to prevent harassing behavior and to promptly correct any that occurred and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that Sam's Club provided. *See Vance,* 570 U.S. at 430. If Mr. Yeary is not a "supervisor," then Sam's Club is liable only if Sam's Club "was negligent either in discovering or remedying the harassment," which requires Mr. Askew to show that Sam's Club "failed to take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Cole v. Board of Trustees of Northern Illinois Univ.,* 838 F.3d 888, 898 (7th Cir. 2016).

The undisputed material facts demonstrate that Mr. Yeary was not a "supervisor." As the Court held in *Vance,* a supervisor is an employee who is "empowered by the employer to take tangible employment actions against the victim. . . ." 570 U.S. at 424. That means, generally, that the person must have the "authority to hire, fire, promote, demote, discipline, or transfer" the plaintiff victim. *Id.* at 429. *Jajeh v. County of Cook,* 678 F.3d 560, 568 (7th Cir. 2012). A person's

13

authority merely to oversee aspects of another employee's job, such as directing work and providing training, does not make that person a supervisor. *Rhodes v. Illinois Dep't of Trans.,* 359 F.3d 498, 506 (7th Cir. 2004).

The undisputed evidence establishes that Mr. Yeary "could not fire, demote, promote, transfer, or discipline" Mr. Askew. (Daniel Dec., ¶ 9). And although Mr. Askew asserts, without any evidentiary support, that Mr. Yeary hired him to work at the Tire Center, this case does not concern any ability to take tangible employment actions relating to hiring. As *Vance* requires, a supervisor must be empowered to take a tangible employment action against the victim; at no time in the period during which Mr. Askew allegedly was subject to a hostile work environment did Mr. Yeary have any authority to take a tangible employment action against him—he could not fire, promote, demote, discipline, or transfer him. Under these facts, the court must conclude that Mr. Yeary, although known as the "team lead" at the Tire Center, was not a supervisor within the meaning of Title VII liability.

In addition, the undisputed evidence establishes that Sam's Club acted reasonably, as a matter of law, in responding to Mr. Askew's complaints about race discrimination and harassment. Nearly immediately after Mr. Askew complained about race discrimination and harassment, the Club Manager (the head of the store) began an investigation. She spoke with Mr. Askew and reviewed his written statements. She interviewed Mr. Hull and Mr. Bennett, who allegedly had witnessed or were involved in some of the incidents described by Mr. Askew. She

interviewed two other Tire Center employees, who were African American and who held the same position as Mr. Askew, about their impressions of the work environment within the Tire Center and about their interactions with Mr. Yeary. She reviewed video footage. And she intended to interview Mr. Yeary as soon as he returned to work from a scheduled surgery, but before that occurred, Mr. Askew was terminated because of his violation of the company's attendance policy.  Even then, Ms. Daniel spoke again to Mr. Askew, encouraged him to reapply for a job, and told him that arrangements could be made to ensure he felt comfortable at work.  Further, even though Mr. Askew already had been terminated, Ms. Daniel interviewed Mr. Yeary about Mr. Askew's allegations when he returned to work.

Against this evidence, Mr. Askew does not argue the investigation was unreasonably delayed, superficial, non-serious, or flawed in some way. He complains only that it took too long, but that argument misstates the evidence.  Mr. Askew states the investigation took more than two months; that's not true. It is Mr. Askew's burden to show that a jury could find that the steps taken by Sam's Club for investigating his complaints and working to remedy them were not reasonable, and he has not done so.

Therefore, Sam's Club is entitled to summary judgment on Mr. Askew's race discrimination claim based on the alleged racially hostile work environment.

### B. The defendant is entitled to summary judgment on Mr. Askew's remaining race discrimination claim and his retaliation claim.

Mr. Askew's remaining claims for race discrimination and retaliation require him to show that he was subjected to an adverse employment action (1) because of

15

his race (to prevail on his race discrimination claim) or (2) because he had complained about race discrimination (his retaliation claim). As explained in *Boss v. Castro,* 816 F.3d 910 (7th Cir. 2016), (a) a Title VII race discrimination claim requires sufficient evidence from which a reasonable jury could conclude that a "materially adverse employment action" was taken against the employee and it was motivated by discriminatory animus and (b) a Title VII retaliation claim requires evidence from which a reasonable jury could conclude that the employee suffered a "materially adverse employment action" that would not have occurred "but for" his engaging in protected activity (such as complaining of race discrimination) *Id.* at 918. *Baines v. Walgreen Co.,* 863 F.3d 656, 661 (7th Cir. 2017) (retaliation claim requires demonstrating that the adverse employment action was taken because of the protected activity).

A materially adverse employment action is one "which visits upon the plaintiff a significant change in employment status." *Boss,* 816 F.3d at 917 (internal quotation and citation omitted). The only materially adverse employment action identified by Mr. Askew was the termination of his employment. But there is no evidence that occurred other than as a result of Mr. Askew's violation of his employer's attendance policy. Although Mr. Askew insists that he was constructively discharged instead, the evidence and reasonable inferences from it do not support that legal claim. *See Smith v. Bray,* 681 F.3d 888, 908 (7th Cir. 2012) (constructive discharge claim fails as a matter of law where an employee has been fired). Mr. Askew had not quit or resigned before Sam's Club terminated his

16

employment on July 11 and Ms. Daniel formally notified him of that termination by telephone on July 12. Instead, at that point on July 12—after his termination—when Ms. Daniel also told Mr. Askew he could reapply for a job at Sam's Club, Mr. Askew expressed that he did not want to interact with Mr. Yeary anymore but would come in and talk. *See* Daniel Dec., ¶¶ 24-25; Askew Dep. at 121:5-8; 122:6-23 (agreeing that Sam's Club terminated his employment and in his telephone conversation with Ms. Daniel on July 12, things were "up in the air"). Later, when Ms. Daniel spoke with Mr. Askew one more time, he told her that he had decided not to return to Sam's Club. (Daniel Dec., ¶ 25).

Because the evidence and reasonable inferences from them are incompatible with Mr. Askew's constructive discharge theory, and the undisputed evidence demonstrates he was terminated for violating the company's attendance policy, Sam's Club is entitled to judgment as a matter of law on Mr. Askew's retaliation claim and his claim that he suffered an adverse employment action because of race discrimination.

## Conclusion

For the foregoing reasons, the court GRANTS the defendant's motion (Dkt. 36) for summary judgment. Judgment will be entered separately.

So ORDERED.

Date: 6/1/2020

*Debra McVicker Lynch*
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system

Via United States mail:
**JANSSEN ASKEW**
P.O. Box 310911
Miami, FL 33231